NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2018-0570

NORTHERN NEW ENGLAND TELEPHONE OPERATIONS, LLC
d/b/a FAIRPOINT COMMUNICATIONS-NNE

v.

TOWN OF ACWORTH & a.

Argued: October 10, 2019
Opinion Issued: November 6, 2020

Devine, Millimet & Branch, Professional Association, of Manchester (Matthew R. Johnson on the brief and orally), for the plaintiff.

Mitchell Municipal Group, P.A., of Laconia (Walter L. Mitchell and Laura Spector-Morgan on the brief, and Ms. Spector-Morgan orally), for the defendants.

HICKS, J.  This appeal arises from a consolidated case that encompasses actions brought by the plaintiff, Northern New England Telephone Operations, LLC d/b/a FairPoint Communications-NNE (FairPoint), against several New Hampshire towns and cities, asserting claims of ultra vires taxation and disproportionate taxation.  As "representative municipalities" in the "test cases" established for this litigation, the defendants, the Town of Durham and the Town of Hanover (Towns), appeal two orders of the Superior Court (McNamara,

J.).  The Towns challenge the superior court's order on summary judgment, ruling that the taxation of FairPoint's use or occupation of municipal rights-of-way in certain test cases was ultra vires because the agreements authorizing such use or occupation did not satisfy the requirements of RSA 72:23, I(b) (2012) (amended 2017, 2018, 2020).  The Towns also challenge the superior court's decision after trial, arguing that the court committed several errors in concluding that FairPoint was entitled to abatements of its tax assessments from the Town of Durham and the Town of Hanover for tax years 2013 and 2011 respectively.  We affirm in part, reverse in part, and remand.

## I.  Background and Procedural History

As a provider of telecommunications services, FairPoint owns poles, conduits, and other related property located in many municipalities in New Hampshire.  The placement of these types of property in, under, or across municipal rights-of-way is governed by a statutory framework.  See King v. Town of Lyme, 126 N.H. 279, 283-84 (1985).  To erect, install, and maintain any such poles, structures, conduits, cables, or wires in, under, or across municipal rights-of-way, a permit or license is required from the relevant municipality.  RSA 231:160 (2009), :161 (2009); see King, 126 N.H. at 284.  RSA 231:161 sets out the procedure for acquiring the required permit or license.  See RSA 231:161; King, 126 N.H. at 284.  As an exception to the procedural licensing requirements of RSA 231:161, previously approved poles, structures, conduits, cables, or wires existing in, under, or across land that subsequently becomes a public highway are "deemed legally permitted or licensed" provided that specified documentation is submitted to the municipality for recording purposes.  RSA 231:160-a (2009).

This litigation involves disputes over the valuation of property relevant to two types of property taxes: (1) a tax on the value of FairPoint's poles and conduits; and (2) a tax on the value of FairPoint's use or occupation of municipal rights-of-way.  A statutory framework governs each type of tax.  With respect to the first, municipalities are permitted to tax "all structures, poles, towers, and conduits employed in the transmission of telecommunication . . . services . . . as real estate in the town in which such property or any part of it is situated."  RSA 72:8-a (2012) (amended 2016); see RSA 72:6 (2012).  In regard to the second type of tax, municipalities can also impose property taxes on another's use or occupation of municipal rights-of-way when the terms of the lease or other agreement authorizing such use or occupation "provide for the payment of properly assessed . . . property taxes" by the other party.  RSA 72:23, I (2012) (amended 2017, 2018, 2020) (applying with equal effect to cities and towns); see RSA 72:6.

FairPoint sued a number of municipalities, seeking abatement of several years' worth of tax assessments on its poles and conduits, and on its use or occupation of municipal rights-of-way.  In May 2014, the superior court

consolidated FairPoint's actions into a "test case" structure in which certain towns and cities would act as "representative municipalities." The consolidated case proceeded in two phases: Phase 1, evaluating FairPoint's claims of ultra vires taxation based upon the interpretation of relevant statutes at summary judgment, and Phase 2, taking selected test cases to trial on the issue of whether specific tax assessments were disproportionate and required abatement.

In Phase 1, the central issue was whether a municipality's failure to comply with the requirements set forth in RSA 72:23, I(b) rendered the municipality's taxation of FairPoint's use or occupation of municipal rights-of-way ultra vires. The parties stipulated to the historical facts relevant to each municipality's taxation of FairPoint. FairPoint moved for summary judgment in eight test cases, arguing that the representative municipalities, including the Town of Durham, acted ultra vires in assessing taxes on its poles and conduits, and/or its use or occupation of municipal rights-of-way, because they had failed to comply with RSA 72:23, I(b). The test-case municipalities objected and filed cross-motions for summary judgment, making several arguments that RSA 72:23, I, did not preclude taxation in the various test-case scenarios.

Following a hearing on the motions, the superior court granted summary judgment to FairPoint on most of its claims of ultra vires taxation related to its use or occupation of municipal rights-of-way. The court ruled, inter alia, that RSA 72:23, I, applies to licenses arising under RSA 231:160-a, and that such licenses "do[] not automatically include the statutorily required tax-shifting language." Moreover, it rejected the argument that FairPoint's use or occupation of municipal rights-of-way is, in substance, a perpetual lease that is "taxable under RSA 72:6 and RSA 73:10 [(2012)] regardless of the presence of RSA 72:23, I(b) tax-shifting language."

The superior court largely denied the municipalities' motions for reconsideration, expanding upon certain parts of its previous order in doing so, including further analysis of the perpetual lease argument and the application of RSA 72:23, I, to licenses arising under RSA 231:160-a. Noting that only a "relatively small number" of the pending cases settled after Phase 1, the superior court scheduled a bench trial for selected test cases "in order to provide the New Hampshire Supreme Court with an appropriate record" to "consider the ultra vires issue[s] as well as the issue of what methodology is appropriate for experts to use in valuing the plaintiff's property" and its use or occupation of the municipalities' rights-of-way.

In Phase 2, the Towns of Durham and Hanover, inter alia, were chosen as test cases for trial to determine whether specific tax assessments — for the 2011 tax year in Hanover, and the 2013 tax year in Durham — warranted abatement. The critical issues for trial were how to determine the valuation of FairPoint's poles and conduits, and the valuation of its use or occupation of the

municipal rights-of-way.  After the trial in April 2018, the superior court concluded that FairPoint was entitled to abatements from the Towns for the tax years in question.  The Towns, inter alia, moved for reconsideration, which the trial court denied.

The Towns appeal the superior court's decision abating their tax assessments at issue in the Phase 2 trial and also appeal certain applications of RSA 72:23, I, by the superior court to the test cases in Phase 1.  We first address the Towns' arguments on the ultra vires issues resolved by the superior court on summary judgment in Phase 1.

## II. Phase 1: Ultra Vires Taxation

The disputes on appeal pertaining to Phase 1 involve only the second of the two types of property taxes implicated by this case — the tax on the value of FairPoint's use or occupation of municipal rights-of-way.  The Towns argue that the superior court erred in ruling that such taxation was ultra vires without the express inclusion of tax-shifting language pursuant to RSA 72:23, I(b) because: (1) licenses arising under RSA 231:160-a contain the required language as a matter of law; and (2) FairPoint's use or occupation of municipal rights-of-way, "in substance," constitutes a perpetual lease.

The first argument was raised below as part of the Phase 1 litigation and was addressed by the trial court.  We conclude that it is properly before us, and, on the merits, we agree with the Towns.

In reviewing the superior court's rulings on cross-motions for summary judgment, we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party, and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law.  Polonsky v. Town of Bedford, 171 N.H. 89, 93 (2018).  If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment.  Id.  We review the superior court's application of the law to the facts de novo.  Id.

In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole.  Id.  We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning.  Id.; RSA 21:2 (2020).  We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  Polonsky, 171 N.H. at 93.  We construe all parts of a statute together to effectuate its overall purpose and to avoid an absurd or unjust result.  Id.  Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation.  Carr v. Town of New

4

London, 170 N.H. 10, 13-14 (2017). Our goal is to apply statutes in light of the legislature's intent in enacting them and in light of the policy sought to be advanced by the entire statutory scheme. Id. at 14. Absent an ambiguity, we need not look beyond the language of the statute to discern legislative intent. segTEL v. City of Nashua, 170 N.H. 118, 120 (2017).

During the relevant times in this case, RSA 72:23, I(b) provided in pertinent part:

> All leases and other agreements, the terms of which provide for the use or occupation by others of real or personal property owned by the state or a city, town, school district, or village district, entered into after July 1, 1979, shall provide for the payment of properly assessed real and personal property taxes by the party using or occupying said property no later than the due date. . . . All such leases and agreements shall include a provision that "failure of the lessee to pay the duly assessed personal and real estate taxes when due shall be cause to terminate said lease or agreement by the lessor." All such leases and agreements entered into on or after January 1, 1994, shall clearly state the lessee's obligations regarding the payment of both current and potential real and personal property taxes, and shall also state whether the lessee has an obligation to pay real and personal property taxes on structures or improvements added by the lessee.

RSA 72:23, I(b). Because no party argues otherwise, we will assume, without deciding, that licenses arising under RSA 231:160-a constitute "other agreements" for purposes of RSA 72:23, I(b). Thus, pursuant to RSA 72:23, I(b), any license arising under RSA 231:160-a "shall provide for the payment of properly assessed real and personal property taxes by the party using or occupying such property." Id. In addition, any such license "shall" include a provision that failure to pay the taxes when due shall be cause to terminate the license, and "shall" clearly state the licensee's obligations regarding the payment of taxes. Id. The use of the word "shall" demonstrates that these are mandatory requirements. See Appeal of Algonquin Gas Transmission, 170 N.H. 763, 774 (2018).

RSA 231:160-a provides:

> Any poles, structures, conduits, cables or wires, the location of which have already been approved by the local land use board . . . , shall, if such location becomes a public highway, be deemed legally permitted or licensed without further proceedings under this subdivision; provided, that copies of the appropriate utilities' easements, work plans, or other data showing locations of

5

such structures, are submitted to the municipality for recording purposes.

RSA 231:160-a (emphasis added). RSA 231:160-a provides that certain poles, structures, conduits, and related property shall "be deemed legally . . . licensed" without further proceedings under the subdivision.[1] Section 160-a applies when a local land use board has previously approved the location of poles, structures, conduits, and related property and that location then becomes a public highway. The usual procedure for obtaining a license for poles, structures, conduits, and related property is set forth in RSA 231:161, which provides, in part:

> Any such person, copartnership or corporation desiring to erect or install any such poles, structures, conduits, cables or wires in, under or across any such highway, shall secure a . . . license therefor in accordance with the following procedure:
>
> I. Jurisdiction.
>
> (a) Town Maintained Highways. Petitions for such . . . licenses concerning town maintained highways shall be addressed to the selectmen of the town in which such highway is located; and they are hereby authorized to delegate all or any part of the powers conferred upon them by the provisions of this section to such agents as they may duly appoint.
>
> . . . .
>
> IV. Licenses. The petitioner may petition such selectmen to grant a license for such poles, structures, conduits, cables or wires. If the public good requires, the selectmen shall grant a license for erecting and installing or maintaining the poles, structures, conduits, cables or wires described in the petition.
>
> V. Provision of Licenses. The selectmen in such license shall designate and define the maximum and minimum length of poles, the maximum and minimum height of structures, the approximate location of such poles and structures and the minimum distance of wires above and of conduits and cables below the surface of the highway, and in their discretion the approximate distance of such poles from the edge of the traveled roadway or of the sidewalk, and may include reasonable requirements concerning the placement of reflectors thereon. Such designation and definition of location may

---

[1] The subdivision at issue is entitled "Lines of Telegraph and Other Companies in Highways," and comprises RSA 231:159 (2009) through RSA 231:182 (2009).

be by reference to a map or plan filed with or attached to the petition or license.

RSA 231:161.

Finally, the procedure for amending a license is set forth in RSA 231:163, which states:

> Any such licensee or any person whose rights or interests are affected by any such license may petition the selectmen for changes in the terms thereof; and after notice to the parties and hearing, the selectmen may make such alterations therein as the public good requires. The selectmen, after notice to any such licensee and hearing, may from time to time revoke or change the terms and conditions of any such license, whenever the public good requires.

RSA 231:163 (2009).

The plain language of RSA 231:160-a resolves the issue before us. The statute provides that poles, structures, conduits, and related property are to be deemed "legally . . . licensed without further proceedings under this subdivision." RSA 231:160-a. The plain meaning of "legally" is "in a legal manner : in accordance with the law." Webster's Third New International Dictionary 1290 (unabridged ed. 2002). As explained above, RSA 72:23, I(b) mandates that any such license "provide for the payment of properly assessed real and personal property taxes by the party using or occupying such property." In addition, any such license must include a provision that failure to pay the duly assessed personal and real estate taxes when due shall be cause to terminate the license, and must clearly state the licensee's obligations regarding the payment of both current and potential real and personal property taxes. See RSA 72:23, I(b). A license that does not comply with the mandatory requirements of RSA 72:23, I(b) is not "in accordance with the law." Webster's Third New International Dictionary, supra. Thus, to be deemed "legally . . . licensed," that is, to be licensed "in accordance with the law," the poles, structures, conduits, and related property at issue must be deemed to be licensed in a manner that complies with the mandatory requirements of RSA 72:23, I(b). Id.; RSA 231:160-a; see RSA 72:23, I(b).

If, as the trial court ruled, a license obtained pursuant to RSA 231:160-a is not deemed to contain the provisions set forth in RSA 72:23, I(b), then the utility would receive a "deemed" license that fails to comply with RSA 72:23, I(b). Because RSA 72:23, I(b) mandates that any such license provide for the payment of properly assessed real and personal property taxes by the party using or occupying the municipality's property, the municipality would then be required to initiate a proceeding under RSA 231:163 to amend the deemed license to bring it into compliance with RSA 72:23, I(b). See N.E. Tel. & Tel. Co.

7

v. City of Rochester, 144 N.H. 118, 119-22 (1999) (Rochester I) (upholding City of Rochester's amendment pursuant to RSA 231:163 of utility's license to add provisions required by RSA 72:23, I(b) because "RSA 72:23, I(b) requires the [City] to implement them" (emphasis added)).  Under RSA 231:163, a municipality must provide notice and a hearing in order to amend the "deemed" license to comply with the law.  Thus, while RSA 231:160-a plainly states that the poles, structures, and related property are to be deemed legally licensed without further proceedings under the subdivision, under the trial court's construction of the statute, municipalities would be required to undertake further proceedings under the subdivision to amend any deemed license obtained under RSA 231:160-a in order to bring the license into compliance with the law.  RSA 231:160-a; see RSA 72:23, I(b).

Although the plain language of the statute suffices to resolve the issue, we note that the trial court's construction of the statute also is contrary to the purpose of the statute.  The obvious purpose of RSA 231:160-a is to place the utility in the same position it would have been had it applied for a license under RSA 231:161, without the need for further proceedings.  See RSA 231:160-a.  By submitting copies of easements, work plans, or other data showing locations of its structures to the municipality for recording and thereby having its poles and structures deemed "legally . . . licensed," the utility avoids the expense and time necessary to file an application under RSA 231:161, and the municipality avoids the expense and time necessary to deal with a license application.  RSA 231:160-a.  When a utility applies for a license under RSA 231:161, it is proper to presume that in granting the license, the municipality will comply with the law, including complying with the requirements of RSA 72:23, I(b).  Cf. United States v. Chemical Foundation, 272 U.S. 1, 14-15 (1926) (stating that absent clear evidence to the contrary, courts presume that public officers have properly discharged their official duties); Appeal of Lathrop, 122 N.H. 262, 265 (1982) (recognizing presumption of regularity attending actions of an administrative agency).  Thus, it is proper to presume that a utility that obtains a license under RSA 231:161 will obtain a license that complies with RSA 72:23, I(b).  Accordingly, in order for the utility to be put in the same position it would have been in had it applied for a license under RSA 231:161, a utility that receives a "deemed" license under RSA 231:160-a must be deemed to have obtained a license that also complies with RSA 72:23, I(b).  We reverse the superior court's grant of summary judgment to FairPoint to the extent that it ruled to the contrary.

The Towns' second challenge to the superior court's Phase 1 order argues that the court erred in determining that FairPoint's use or occupation of municipal rights-of-way was "not pursuant to a perpetual lease that gave rise to an independently taxable property interest." (Bolding and capitalization omitted.)  To the extent the Towns claim that the court erred in finding that individual licenses authorizing FairPoint's use or occupation were not, in substance, perpetual leases, the only licenses we may properly review on

8

appeal are those between FairPoint and the Town of Durham, and FairPoint and the Town of Hanover. See ACG Credit Co. v. Gill, 152 N.H. 260, 264 (2005) (as a general rule, parties do not have standing to assert the rights of another); Duncan v. State, 166 N.H. 630, 640 (2014) (issues of standing may be raised sua sponte). We do not read the Towns' arguments on appeal to assert that their particular agreements with FairPoint in fact constitute perpetual leases; accordingly, we deem any such arguments waived. See N.H. Right to Life v. Dir., N.H. Charitable Trusts Unit, 169 N.H. 95, 102 (2016) (arguments not briefed are waived on appeal); see also Appeal of Reid, 143 N.H. 246, 249-50 (1998) (explaining that an analysis of whether an agreement constitutes a perpetual lease must begin with a review of the language of the agreement itself).

Nevertheless, we understand the Towns to argue that, independent of any particular agreement with FairPoint, the nature of FairPoint's use or occupation of municipal rights-of-way as an owner of telephone poles, conduits, and related property constitutes a perpetual lease as a matter of law, and, therefore, any agreements authorizing such use or occupation need not contain the tax-shifting language of RSA 72:23, I, to authorize taxation. To the extent we can consider this argument in the absence of a particular agreement, but see Appeal of Reid, 143 N.H. at 249-50, we disagree.

The Towns assert that because FairPoint's use or occupation of municipal rights-of-way is properly characterized as a perpetual lease, FairPoint is "the owner of its interest in the public rights-of-way for property taxation purposes," meaning there is no use or occupation of municipally owned property to trigger RSA 72:23, I. Therefore, they argue, the superior court erred in concluding that taxation of FairPoint was ultra vires without the language required by RSA 72:23, I(b). The plain language of RSA chapter 231, our case law interpreting it, and the plain language of RSA 72:23 contradict the Towns' argument.

RSA 231:161 and RSA 231:160-a, which relate specifically to the placement of poles, conduits, and related property in public highways, plainly exhibit the legislature's intent to authorize a telecommunications provider's use or occupation of public rights-of-way via a license (or a permit) rather than a perpetual leasehold. See RSA 231:160-a, :161; see also Polonsky, 171 N.H. at 93. Furthermore, we have expressly held that licenses arising under RSA 231:161, authorizing the installation and maintenance of telephone poles, conduits, and related property in public rights-of-way, are subject to the requirements of RSA 72:23, I. Rochester I, 144 N.H. at 121-22.

In support of their argument, the Towns reference RSA 231:163 and other statutory provisions, rules of the New Hampshire Public Utilities Commission, and case law that, they contend, all limit a municipality's ability to "unilaterally terminate a utility's use of municipal rights-of-way." (Emphasis

9

omitted.)  For example, the Towns point out that "[w]hile a municipality may alter licenses it issues, a municipality's authority is limited by the 'public good' standard."  See RSA 231:163; see also Verizon New England v. City of Rochester, 151 N.H. 263, 269-70 (2004) (Rochester II) ("Under the plain language of [RSA 231:163], a [municipality] may change the terms and conditions of a license that it has issued whenever the public good requires."). However, we are unpersuaded that such circumstances compel a finding that FairPoint's use or occupation of municipal rights-of-way constitutes a perpetual lease as a matter of law, capable of avoiding the need to comply with RSA 72:23, I(b) to authorize taxation.  See Rochester II, 151 N.H. at 267, 270; segTEL, 170 N.H. at 120.

In Rochester II, we agreed with the trial court that "[w]hatever interests the [municipality] . . . possesses in the rights of way, those interests are 'owned' for purposes of determining whether non-governmental entities that use or occupy those interests in the rights of way must pay properly assessed real estate taxes" under RSA 72:23, I.  Rochester II, 151 N.H. at 268 (quotation and brackets omitted).  In doing so, we examined the plain language of RSA 72:23, I(b) and concluded that "[t]he statute does not define the manner in which the [municipality] must 'own' the land . . . [and] because of the [legislatively defined] ways in which public highways are created, a [municipality] typically has only a qualified property interest in the public ways."  Id.; see RSA 72:23, I. We nevertheless reasoned that "the legislature intended for this type of ownership to be sufficient to allow a [municipality] to impose real estate taxes on a user or occupier of the public ways" under RSA 72:23, I, Rochester II, 151 N.H. at 268 — in other words, that this type of ownership was sufficient to trigger RSA 72:23, I, see id.  Accordingly, we conclude that the nature of FairPoint's use or occupation of municipal rights-of-way does not, as a matter of law, render it the "owner" of its interest in the rights-of-way such that the requirements of RSA 72:23, I, are inapplicable.  Thus, we hold that the superior court did not err in rejecting the argument that taxation of FairPoint's use or occupation of municipal rights-of-way was not ultra vires because its use constituted a perpetual lease.

The Towns' reliance on Piper v. Meredith, 83 N.H. 107 (1927), in support of this argument is misplaced.  As an initial matter, we note that our conclusion in Piper, that the plaintiff held a perpetual lease in the municipal property at issue, was based upon our review of his actual lease agreement with the Town of Meredith.[2]  See Piper, 83 N.H. at 107-10.  As described above, this appeal does not involve such a review.  Moreover, as FairPoint identifies,

---

[2] Similarly, our conclusion in Appeal of Reid, that the petitioners' interests in the properties at issue were not perpetual leases, was based upon our review of the actual language of the relevant agreements.  Appeal of Reid, 143 N.H. at 249-50.  As we explained, the Board of Tax and Land Appeals erred in "apparently rel[ying] solely on extrinsic evidence in determining that 'the evidence was clear that . . . [the] leases have been renewed for lengthy periods and would continue to be renewed indefinitely.'"  Id. at 250 (brackets omitted).

the law applied in Piper to determine, in 1927, that the plaintiff's perpetual leasehold was taxable, see id. at 110-12, pre-dates the language of RSA 72:23, I, that is at the heart of this appeal. RSA 72:23, I, specifically requires "leases and other agreements" entered into after the dates specified that provide for the use or occupation of public rights-of-way to contain the prescribed tax-shifting language in order to authorize taxation. RSA 72:23, I(a)-(b).

Accordingly, we reject the Towns' second challenge to the superior court's Phase 1 order, and conclude that the trial court did not err in determining that FairPoint's use or occupation of municipal rights-of-way was not pursuant to a perpetual lease that gave rise to an independently taxable property interest.

### III. Phase 2: Disproportionate Taxation

We next turn to the Towns' challenges to the superior court's decision in Phase 2, concluding that FairPoint was taxed disproportionately in the 2013 tax year by the Town of Durham and in the 2011 tax year by the Town of Hanover.[3] The Towns' challenges implicate the court's valuations pertinent to both types of property taxes outlined above. Following a five-day bench trial, the superior court found, inter alia, that FairPoint had met its burden of demonstrating that it was taxed disproportionately by the Towns for the respective tax years in question. The court ruled that FairPoint was entitled to a $31,348.40 abatement from the Town of Hanover, and a $107,333.43 abatement from the Town of Durham.

On appeal, we sustain the findings and rulings of the trial court unless they are lacking in evidentiary support or tainted by error of law. Public Serv. Co. of N.H. v. Town of Bow, 170 N.H. 539, 541 (2018). Determination of fair market value is an issue of fact. Appeal of Pennichuck Water Works, 160 N.H. 18, 37 (2010). It is extraordinarily difficult to value public utilities, and we give the trier of fact considerable deference in this area. Public Serv. Co. of N.H., 170 N.H. at 542.

Although the parties and the superior court are seeking to have us clarify "what methodology is appropriate for experts to use in valuing the plaintiff's property and the [municipalities'] rights-of-way," we decline to do so. The decision to adopt a uniform methodology for valuing utility property and the use or occupation of public rights-of-way belongs to the legislature, not this court.[4] See Appeal of N.H. Elec. Coop., 170 N.H. 66, 86 (2017). We have never

---

[3] We note that the Towns' arguments on appeal are jointly asserted and do not identify any specific challenges to either of the two specific abatements at issue.

[4] In 2016, the legislature passed House Bill 1198, which adopted the following formula for determining "[t]he value of wooden poles or conduits employed in the transmission of telecommunications owned in whole or in part by telephone utilities . . . for purposes of tax assessment against said entity . . . : the Replacement Cost New (RCN) of the telecommunications

attempted to tie the factfinder's hands with a rigid fair market value formula in the absence of legislative directive.  Id. at 74.  Rather, judgment is the touchstone.  Id.  We proceed with our review accordingly.

To succeed on a tax abatement claim, a taxpayer has the burden of proving by a preponderance of the evidence that it is paying more than its proportional share of taxes.  Id. at 73.  "To carry the burden of proving disproportionality, the taxpayer must establish that the taxpayer's property is assessed at a higher percentage of fair market value than the percentage at which property is generally assessed in the town."  Id. (quotation omitted).  A taxpayer cannot carry its burden by simply offering evidence tending to show that an assessor used flawed valuation methodology; it must also produce some credible evidence regarding the fair market value of its property.  Porter v. Town of Sanbornton, 150 N.H. 363, 369 (2003) ("While it is possible that a flawed methodology may lead to a disproportionate tax burden, the flawed methodology does not, in and of itself, prove the disproportionate result.").

As we have repeatedly stated, the trier of fact may use any one or a combination of five appraisal techniques in valuing public utility property: original cost less depreciation (rate base or net book), comparable sales, cost of alternative facilities, capitalized earnings, and reproduction cost less depreciation.  Public Serv. Co. of N.H., 170 N.H. at 542.  Typically, all relevant factors must be considered, but a trier of fact need not allocate specific weight to any one of the approaches listed.  Id.  We have recognized that "[t]he search for fair market value is not an easy one, and is akin to a snipe hunt carried on at midnight on a moonless landscape."  Id. (quotation omitted).

At trial, each party relied upon one expert witness.  FairPoint presented expert testimony from Ann Bulkley of Concentric Energy Advisors, Inc., and the Towns presented expert testimony from George Sansoucy of George E. Sansoucy, P.E., LLC.  Bulkley and Sansoucy each offered their expert opinions on the proper valuation of FairPoint's poles and conduits, and FairPoint's use or occupation of municipal rights-of-way.

With respect to the valuation of FairPoint's poles and conduits, the Towns first argue on appeal that the superior court "inappropriately shifted the burden of proof" from FairPoint to the Towns because, they argue, no reasonable factfinder could have found Bulkley's "New England Utility Survey" (Survey), used in her valuation of FairPoint's poles and conduits, credible.  The Towns assert that, therefore, absent a credible expert from FairPoint, the court must have shifted the burden of proof to the Towns to demonstrate why their original assessments were correct in order to ultimately conclude that FairPoint

pole or conduit, less depreciation calculated on a straight-line basis for a period of 40 years with a residual value of 20 percent."  RSA 72:8-c (Supp. 2019).  However, given the timing of its enactment, this statutory formula is not applicable to this appeal.

was entitled to abatements. The Towns argue that the court could not have credited Bulkley's Survey because the data on which she relied was not disclosed to the Towns or to the court, that it was not the Towns' responsibility to seek to compel disclosure, and that the court's error "is even more glaring" because the parties did not waive the statutory expert disclosure requirements under RSA 516:29-b (Supp. 2019).

The Towns focus much of their argument on an alleged discovery violation regarding Bulkley's failure to disclose the underlying "raw data" of her Survey, thus rendering the Survey too unreliable for the court to consider; yet, the Towns stipulated to the admission of the "expert reports" as full exhibits at trial, and the Towns aver on appeal that Bulkley's Survey was "clearly admissible." But see O'Donnell v. Moose Hill Orchards, 140 N.H. 601, 604 (1996) (explaining that a discovery violation with respect to expert disclosures goes to the admissibility of the expert's testimony). Thus, despite their invocation and lengthy discussion of RSA 516:29-b, the Towns' argument effectively criticizes only the weight the superior court accorded to Bulkley's opinions on the valuation of FairPoint's poles and conduits, i.e., the court's evaluation of the credibility of FairPoint's expert's opinions. For the reasons discussed below, we find no reason to disturb the court's findings regarding Bulkley's, or Sansoucy's, credibility.

The Towns also argue that the court's valuation of FairPoint's poles and conduits "allow[ed] property to escape taxation." They argue that by crediting Bulkley's opinions and rejecting Sansoucy's, the court's valuation did not properly account for "attacher income,"[5] "installation and construction costs," mobilization costs, ledge-boring and bedrock installation costs, assemblage costs,[6] and "contributions in aid of construction" (CIAC).[7] Even assuming these items were not included in Bulkley's valuation as credited by the superior court, we cannot conclude that the court erred. Absent a legislative directive, we will not tie the factfinder's hands with a rigid fair market value formula for valuing public utilities. Appeal of N.H. Elec. Coop., 170 N.H. at 74, 86; cf. Public Serv. Co. of N.H., 170 N.H. at 542 ("We have never held that a single valuation approach or specific combination of approaches is correct as a matter of law.").

---

[5] As referenced by the parties and the superior court, "attacher income" is income earned by FairPoint from "other utilities and cable companies" in exchange for the ability to attach their equipment to and use FairPoint's poles.

[6] As referenced by the parties and the superior court, "assemblage costs" refer to costs associated with creating the right to use public rights-of-way.

[7] As referenced by the parties and the superior court, "CIAC costs" refer to the costs of poles paid for by parties other than, in this case, FairPoint.

Bulkley and Sansoucy both utilized a replacement cost new less depreciation approach (RCNLD) to value FairPoint's poles and conduits, and, as the court found, "followed the same general way of reaching RCNLD." Differences in the experts' methodologies regarding if and how to account for attacher income and the costs identified by the Towns on appeal implicate the credibility of each expert's valuation, see Appeal of N.H. Elec. Coop., 170 N.H. at 77, 86, and "conflicts in the evidence were to be resolved by the trial judge, who could accept or reject such portions of the evidence presented as he found proper, including that of the expert witnesses," Public Serv. Co. of N.H., 170 N.H at 542 (quotation omitted). The fact that each utility appraisal involves numerous discretionary decisions is precisely why the trial court, as the factfinder, is in the best position to weigh the testimony and determine whether an appraisal presents an accurate opinion of market value. Appeal of N.H. Elec. Coop., 170 N.H. at 77.

The Towns are incorrect in arguing that Southern New Hampshire Water Co. v. Town of Hudson, 139 N.H. 139 (1994), stands for the proposition that CIAC "is required to be included in the valuation of taxable property in New Hampshire." See Southern N.H. Water Co., 139 N.H. at 141-42 (noting, in the context of affirming that the trial court did not err in crediting the town's expert's reproduction cost calculation over the calculation of the utility's expert, that the reason provided by the utility's expert for excluding "over two million dollars' worth of property donated to the utility by developers" rendered his calculation "suspect"). The Towns also argue, "There is nothing in New Hampshire case law which indicates that Sansoucy's approach [to including attacher income in his valuation] is inappropriate or overstates the fair market value of the poles and conduits." Yet, the lack of precedent rejecting Sansoucy's approach would not compel the superior court to credit Sansoucy's approach or reject Bulkley's, which, according to the Towns, "ignored the value added to the poles and conduits through the attacher income." Nor would the existence of precedent adopting Sansoucy's approach in a prior case compel the superior court to credit said approach here. See Appeal of N.H. Elec. Coop., 170 N.H. at 74; cf. Public Serv. Co. of N.H., 170 N.H. at 542-43 ("[T]he credibility of an appraisal is a question of fact that the trial court must decide based upon the evidence presented in a given case.").

Concerning assemblage costs, the court found that they "should be associated with the value of the poles and conduits themselves, and not as part of the use of . . . the [rights-of-way]," but, the Towns assert, "it then failed to add those assemblage costs to its value of the poles and conduits despite ruling them taxable." We understand the court's discussion of assemblage costs to explain why, in part, it rejected Sansoucy's valuation of FairPoint's use or occupation of public rights-of-way, not to indicate that it had concluded that a valuation of FairPoint's poles and conduits must include assemblage costs in order to be credible. See In the Matter of Salesky & Salesky, 157 N.H. 698, 702 (2008) ("The interpretation of a court order is a question of law, which we

14

review de novo.").  Nor can we conclude that the court erred as a matter of law in its determination of value for FairPoint's poles and conduits, crediting Bulkley's Survey in doing so, without specifically accounting for assemblage costs.  See Appeal of N.H. Elec. Coop., 170 N.H. at 77, 86.

To the contrary, the credibility of an appraisal is a question of fact that the trial court must decide based upon the evidence presented in a given case, Public Serv. Co. of N.H., 170 N.H. at 542-43, and the trial court is in the best position to determine whether an appraisal presents an accurate opinion of market value, Appeal of N.H. Elec. Coop., 170 N.H. at 77.  Here, the superior court exercised reasoned judgment in weighing Bulkley's and Sansoucy's appraisals to derive, what it determined to be, an accurate valuation of FairPoint's poles and conduits.  See id. at 74 (explaining judgment is the touchstone of valuing utility property).

Nevertheless, in regard to their arguments about the court's failure to properly include certain costs, the Towns maintain that there was "no factual basis" for the court's stated reasoning in rejecting Sansoucy's mobilization costs, and there was "no evidence that supported" the court's finding that Bulkley's Survey "presumably include[d] mobilization cost[s]."  Moreover, the Towns also argue that the superior court erred in finding Bulkley's Survey reliable because the court assumed that "any bedrock installation costs included in the Survey would be the same for each town, regardless of the number of poles actually installed in bedrock in each town," and also merely assumed that the Survey included "real world ledge boring costs."  Similarly, with respect to the valuation of FairPoint's use or occupation of municipal rights-of-way, the Towns argue that the superior court erroneously credited Bulkley's expert opinion because her conclusions as to "the width of the utility corridor," the "percentage of use" attributable to FairPoint, and her equal allocation of the use of the utility corridor among FairPoint and attachers were "not supported by the record."

We conclude that the superior court's findings regarding each expert's treatment of attacher income, mobilization costs, and ledge-boring and bedrock installation costs, as relevant to its valuation of FairPoint's poles and conduits, are supported by the record.  The same is true for the court's findings regarding each expert's determinations of the utility corridor's width and use-allocations, relevant to valuations of FairPoint's use or occupation of municipal rights-of-way.  However, we agree with FairPoint that these arguments, claiming there was "no evidence" in the record or "no factual basis" to support various components of the court's valuation of FairPoint's poles and conduits and its valuation of FairPoint's use or occupation of municipal rights-of-way, likewise sound in criticism of the court's crediting of Bulkley's opinions and rejection of Sansoucy's.

15

For example, in asserting that portions of Bulkley's valuation of FairPoint's use or occupation of municipal rights-of-way were "not supported by the record," the Towns argue that she "essentially adopted" Judge Morrill's reasoning in Verizon New England, Inc. v. City of Rochester, Nos. 05-E-400, 05-E-401, 05-E-402, 2006 WL 3742673 (N.H. Super. Ct. Nov. 9, 2006) (Verizon), and that the court erred in crediting her appraisal when "there [was] no evidence in the record to support" applying Judge Morrill's findings to this case. (Italics omitted.) However, after a detailed review of Bulkley's and Sansoucy's methodology and the approach used by Judge Morrill in Verizon, the superior court found that both experts "employed relatively similar approaches" to calculating the value of FairPoint's use or occupation of municipal rights-of-way, and that "their approaches [were] comparable to those of the appraisers" in Verizon. Bulkley testified that the Verizon decision was the basis for her determination of the utility corridor's width and testified that the same figures were "appropriate" in this case. While the court did find that Bulkley's ten-percent allocation of use of the rights-of-way to FairPoint was the same result reached in Verizon, it independently evaluated her testimony about the propriety of her calculation for the tax assessments in this case. The court also evaluated Sansoucy's proffered seventy-percent allocation of use to FairPoint and made detailed findings explaining why it found his determination to be unreasonable. See Public Serv. Co. of N.H., 170 N.H. at 542 ("As the fact finder, it was proper for the trial court to weigh the conflicting expert testimony.").

Furthermore, in arguing that there was no evidence to justify the court's determination to allocate the use of rights-of-way equally among FairPoint and associated attachers, the Towns assert that "[t]he only evidence was Ms. Bulkley's testimony." Yet, the superior court credited this testimony after weighing it against Sansoucy's criticism of Bulkley's approach. See id. Although the Towns disagree with Bulkley's conclusions, we defer to the superior court's reasoned judgment of expert credibility. See id.; Appeal of N.H. Elec. Coop., 170 N.H. at 74.

Similarly, the Towns' argument regarding the court's determination of the depreciation period for poles is, fundamentally, an argument about Bulkley's credibility. The Towns claim that the court erred in "relying upon House Bill 1198 (2016) as a proper method of determining the depreciable life of a pole," (bolding and capitalization omitted), as a substitute for either expert's opinion. However, Bulkley put forth two analyses relating to pole depreciation, one of which utilized HB 1198 to recommend a forty-year depreciation period, and the superior court explicitly noted that "Bulkley conceded" that the forty-year period was reasonable, though "at the higher end," for poles. After an in-depth analysis, the superior court found Bulkley's opinion regarding the reasonableness of a forty-year depreciation period more persuasive than Sansoucy's advocacy for a sixty-year period. The court's

16

adoption of a forty-year pole depreciation period is supported by the record; therefore, we will not disturb it.  See Public Serv. Co. of N.H., 170 N.H. at 542.

We conclude that the superior court's decisions to credit various opinions of Bulkley and to reject those of Sansoucy were reasonable based upon the evidence presented at trial.  See id.  The superior court did not accept Bulkley's valuations carte blanche, but engaged in a mindful evaluation of her opinions, even rejecting some — which, contrary to the Towns' argument, did not compel the superior court to discredit Bulkley's expert opinions in their entirety.  Appeal of N.H. Elec. Coop., 170 N.H. at 74 ("When faced with conflicting expert testimony, a trier of fact is free to accept or reject an expert's testimony, in whole or in part." (quotation and brackets omitted)).  Because there is support in the record for the superior court's valuations, we cannot find that the court erred as a matter of law in accepting Bulkley's opinions on the value of FairPoint's poles and conduits, and on FairPoint's use or occupation of municipal rights-of-way.  See, e.g., Public Serv. Co. of N.H., 170 N.H. at 543.

The Towns raise a question of law in their challenge to the superior court's decision in Phase 2 — that the court erred in concluding guy wires (guys) and anchors are not taxable under RSA 72:8-a.  This question arose at trial because Sansoucy had included the cost of guys and anchors in valuing FairPoint's poles, which the court found "add[ed] substantially" to Sansoucy's valuation.  During the relevant times, RSA 72:8-a provided in part:

> [A]ll structures, poles, towers, and conduits employed in the transmission of telecommunication, cable, or commercial mobile radio services shall be taxed as real estate in the town in which such property or any part of it is situated.  The valuation of such property shall be based on its value as real estate.  Other devices and equipment, including wires, fiber optics, and switching equipment employed in the transmission of telecommunication, cable, or commercial mobile radio services shall not be taxable as real estate.

RSA 72:8-a.  The Towns argue that guys and anchors "are clearly 'structures' as that term is used in the statute because they are constructed in conjunction with poles to keep them upright and stable."  In the alternative, the Towns argue that even if guys and anchors are not clearly "structures," the statute "contemplates two categories of property: those parts which actively transmit services; and those that are the physical hosts for such transmission parts," the latter category being taxable while the former is not.  Because, the Towns contend, guys and anchors are part of the latter category, they are taxable.  We find the Towns' arguments unpersuasive.

17

The assessment and collection of taxes must be based upon legislative authority.  segTEL, 170 N.H. at 120.  It is well settled that the authority to tax "must be found within the letter of the law and is not to be extended by implication."  Pheasant Lane Realty Trust v. City of Nashua, 143 N.H. 140, 143 (1998) (quotation omitted).  We review the superior court's statutory interpretation de novo.  Polonsky, 171 N.H. at 93.

Turning to the Towns' alternative argument first, we do not agree that RSA 72:8-a distinguishes between taxable and nontaxable property based upon the property's role in transmitting telecommunications services, i.e., whether the property "actively transmit[s] services" or is a "physical host[]."  The plain language of the statute identifies both taxable property and nontaxable property as being "employed in the transmission of telecommunication, cable, or commercial mobile radio services."  RSA 72:8-a.  We presume that the legislature's consistent use of this language was intended to convey the same meaning.  See id.; see also, e.g., Anuj C. Desai, The Dilemma of Interstatutory Interpretation, 77 Wash. & Lee L. Rev. 177, 202 n.98 (2020) (referencing the "presumption of consistent usage" canon of statutory construction, "which presumes that when a word [or phrase] is used more than once in a text, the meanings are consistent").  Moreover, we will not add language that the legislature did not see fit to include, Polonsky, 171 N.H. at 93, to create a distinction in how the relevant property is in fact "employed in the transmission of telecommunication . . . services," RSA 72:8-a; see id.; Pheasant Lane Realty Trust, 143 N.H. at 143.

This leaves us with the question of whether guys and anchors are taxable as "structures" under RSA 72:8-a.  We conclude they are not.  In doing so, we need not define "structures" as used in RSA 72:8-a or articulate how the term differs from "[o]ther devices and equipment," which are nontaxable, RSA 72:8-a, because a related statute demonstrates that guys and anchors were not intended as "structures," see RSA 231:161; see also Rochester II, 151 N.H. at 267 ("When interpreting two statutes which deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes.").  To refresh, RSA 231:161 provides the licensing, and permitting, procedure for erecting or installing telecommunications poles, structures, conduits, cables, or wires in public highways.  See RSA 231:161.  We now look to subparagraph VI, describing the effect of a license, which states in relevant part:

> The holder of such a license, hereinafter referred to as licensee, shall thereupon and thereafter be entitled to exercise the same and to erect or install and maintain any such poles, structures, conduits, cables, and wires in approximately the location designated by such license and to place upon such poles and structures the necessary and proper guys, cross-arms, fixtures,

18

transformers and other attachments and appurtenances which are
required in the reasonable and proper operation of the business
carried on by such licensee . . . .

RSA 231:161, VI (emphasis added). Under RSA 231:161, VI, "necessary and
proper guys, cross-arms, fixtures, transformers and other attachments and
appurtenances" required in the reasonable and proper operation of a licensee's
business are "place[d] upon . . . poles and structures." Id. Thus, guys and
anchors are not themselves "structures"; rather, they are "place[d] upon"
structures and poles. Id.; see id. Construing the term "structures" in RSA
72:8-a so as not to contradict this interpretation of RSA 231:161, VI, we
conclude that guys and anchors are not "structures" within the meaning of
RSA 72:8-a. See Rochester II, 151 N.H. at 267. Therefore, we hold that guys
and anchors are not taxable under RSA 72:8-a. See segTEL, 170 N.H. at 120.
The parties have not asked us to determine whether guys and/or anchors may
be relevant to the taxation of another's use or occupation of public rights-of-
way under RSA 72:23, I; thus, we decline to address this question.

Accordingly, we affirm the superior court's decision in Phase 2, finding
that FairPoint met its burden to prove it was taxed disproportionately by the
Towns and consequently abating the two tax assessments at issue.

## IV. Conclusion

In sum, the superior court's Phase 1 order on summary judgment is
reversed in part and affirmed in part, and its Phase 2 decision is affirmed. We
have reviewed the Towns' remaining appellate arguments and conclude that
they do not warrant further discussion. See Vogel v. Vogel, 137 N.H. 321, 322
(1993). The issue regarding the admissibility of a treatise at trial raised in the
Towns' notice of appeal was not briefed; thus, we deem it waived. Dietz v.
Town of Tuftonboro, 171 N.H. 614, 626 (2019).

Affirmed in part; reversed in
part; and remanded.

HOURAN and BROWN; JJ., retired superior court justices, specially
assigned under RSA 490:3, concurred; HANTZ MARCONI and DONOVAN, JJ.,
concurred in part and dissented in part.

HANTZ MARCONI and DONOVAN, JJ., concurring in part and dissenting
in part. We concur with part III of the majority opinion and with the majority's
treatment of the Towns' perpetual lease argument in part II. However, we
disagree with the majority's decision in part II regarding licenses arising under
RSA 231:160-a (2009), which holds that section 160-a licenses contain the tax-
shifting language required by RSA 72:23, I(b) (2012) (amended 2017, 2018,
2020) "as a matter of law."

19

The majority concludes that "[t]he plain language of RSA 231:160-a resolves the issue before us," resting on the phrase stating that poles and utility property shall be "deemed legally permitted or licensed without further proceedings under this subdivision." RSA 231:160-a. Were we to conclude otherwise, the majority opines, licenses created under section 160-a would "not [be] in accordance with the law" because RSA 72:23, I(b) mandates the inclusion of certain tax-shifting language. See id.; RSA 72:23, I(b). In other words, the majority asserts that the act of "legally" creating a license under section 160-a must automatically satisfy the requirements of RSA 72:23, I(b) because those requirements are mandatory.

While we certainly agree that RSA 72:23, I(b) sets out mandatory requirements for licenses that provide for the use or occupation of municipal rights-of-way, see RSA 72:23, I(b), we do not agree that, as a matter of logic, it follows that the creation of such a license must, or even can, automatically satisfy these mandatory requirements of licensure.

Licenses created under either section 160-a or section 161 provide for the use or occupation of municipal rights-of-way.[8] See RSA 231:160-a, :161. As such, licenses created under either provision[9] trigger the applicability of RSA 72:23, I(b).[10] See RSA 72:23, I(b). The majority's leap in logic from "mandatory requirement of licensure" to "automatic satisfaction upon license creation" is particularly questionable in the context of RSA 72:23, I(b). When we look beyond the fact that subparagraph I(b) prescribes mandatory requirements, to what the statute actually makes mandatory, it is evident that the mere creation of a license cannot automatically satisfy the requirements of RSA 72:23, I(b).

As a practical matter, attempting to incorporate the required language of RSA 72:23, I(b) into a license "as a matter of law" will never satisfy all of the

---

[8] Both RSA 231:160-a and RSA 231:161 refer to the real estate upon which poles, conduits, and related property are installed and maintained as "public highways." RSA 231:160-a; RSA 231:160 (2009); see RSA 231:161.

[9] For purposes of this appeal, we, like the majority, assume without deciding that licenses arising under RSA 231:160-a constitute "other agreements" under RSA 72:23, I(b). See also N.E. Tel. & Tel. Co. v. City of Rochester, 144 N.H. 118, 121 (1999) (Rochester I) (holding licenses arising under RSA 231:161 constitute "other agreements" for purposes of RSA 72:23, I).

[10] RSA 72:23, I, provides that "[l]ands and the buildings and structures thereon and therein and the personal property owned by the state of New Hampshire or by a New Hampshire city, town, school district, or village district" are "exempt from taxation." RSA 72:23, I(a). In subparagraph I(b), the statute creates an exception to this exemption which is implicated when another "use[s] or occup[ies]" public highways and the subparagraph plainly sets forth that which is required to confer authority upon a municipality to tax another's use or occupation of municipal rights-of-way. RSA 72:23, I(b); see id. If subparagraph I(b) is implicated, but its requirements are not in fact satisfied, that municipal right-of-way remains "exempt from taxation." See RSA 72:23.

20

mandatory requirements of subparagraph I(b) because one of said requirements is that the license "shall also state whether the [licensee] has an obligation to pay real and personal property taxes on structures or improvements added by the [licensee]." Id. (emphasis added). This language of subparagraph I(b) does not itself communicate, one way or another, whether the licensee is obligated to pay property taxes on structures or improvements the licensee adds, see id., and incorporating that language into a section 160-a license "as a matter of law" does nothing more to satisfy this requirement. Therefore, even under the majority's reasoning, a license created under RSA 231:160-a will always fail to be "in accordance" with at least one mandatory requirement of RSA 72:23, I(b). See id.

We agree with FairPoint and with Judge McNamara that the plain language of subparagraph I(b) requires that express provisions providing for the payment of property taxes be set forth in the applicable license; the language cannot be included as a matter of law, and it must be included as a matter of fact. See id. (stating that leases and other agreements "shall provide for the payment of properly assessed . . . taxes," "shall include a provision that 'failure . . . to pay . . . taxes . . . shall be cause to terminate said [license],'" "shall clearly state . . . obligations regarding . . . taxes," and "shall also state whether the [licensee] has an obligation to pay . . . taxes on structures or improvements" (emphases added)); see also Pheasant Lane Realty Trust v. City of Nashua, 143 N.H. 140, 143 (1998) (it is well settled that the authority to tax "must be found within the letter of the law and is not to be extended by implication" (quotation omitted)). The plain language is also clear that its requirements apply to "[a]ll leases and other agreements" providing for the use or occupation of municipal rights-of-way, including, as both parties assert in this appeal, licenses arising under RSA 231:160-a. RSA 72:23, I(b); see id.

However, the majority finds that, contrary to the plain language of RSA 72:23, I(b), the statute applies differently to section 160-a licenses because, under section 160-a, poles and utility property shall be "deemed legally permitted or licensed without further proceedings under this subdivision." RSA 231:160-a. Beyond its explicit reliance on the fact that the requirements of RSA 72:23, I(b) are mandatory, we are compelled to infer from the majority's reasoning that a valid permit or license cannot be created under section 160-a without including the required language of RSA 72:23, I(b). See id. That subparagraph I(b) sets forth mandatory requirements for licenses providing for the use or occupation of public rights-of-way, however, does not mean that a license cannot be legally created absent the required language. See RSA 72:23, I(b); see also RSA 231:160-a, :161.

To reach its conclusion, the majority defines "legally" (being "in accordance with the law"), but does not clarify what it means to become "permitted or licensed," i.e., the action that the statute deems to be accomplished in accordance with the law. See generally RSA 231:160-a. The

21

only arguable attempt at this clarification is the majority's statement that "[t]he obvious purpose of RSA 231:160-a is to place the utility in the same position it would have been had it applied for a license under RSA 231:161, without the need for further proceedings." Interestingly, this point is characterized as a policy consideration supporting the majority's interpretation of section 160-a. To our view, this point, that section 160-a was intended to provide a parallel result to the licensing procedure of section 161, which we agree is obvious, is not one of policy, but one integral to the statutory interpretation necessitated by this case.

In conducting its interpretation of RSA 231:160-a, the majority does not examine the plain language of RSA 231:161, nor does it address our case law interpreting how RSA 72:23, I, applies to section 161. Had it done so, it would be clear that satisfying the requirements of RSA 72:23, I(b) has not been, nor can it be, interpreted as necessary to create a license under section 161. See RSA 231:161; Verizon New England v. City of Rochester, 156 N.H. 624, 625-26 (2007) (Rochester III) (discussing N.E. Tel. & Tel. Co. v. City of Rochester, 144 N.H. 118, 121 (1999) (Rochester I), and Verizon New England v. City of Rochester, 151 N.H. 263, 267 (2004) (Rochester II)). Compare Rochester II, 151 N.H. at 266-67 (upholding the trial court's ruling that the city could lawfully amend Verizon's section 161 licenses to require Verizon to pay real estate taxes), with Sandra Janvrin v. Federal National Mortgage Association & a., No. 2017-0721, 2019 WL 3037105, at *5-6 (N.H. July 11, 2019) (unpublished order)[11] (explaining that the court has not decided whether a void contract can be amended to become enforceable). Therefore, we maintain that it is inappropriate to apply such a requirement to the creation of a license under section 160-a, which, both we and our colleagues agree, constitutes the parallel licensing process to section 161.

RSA 231:161 sets forth the procedure by which an entity that "desir[es] to erect or install" utility property in, under or across public rights-of-way must "secure a permit or license" to do so. RSA 231:161. Paragraph VI outlines the "[e]ffect" of the license, namely that the licensee "shall thereupon and thereafter be entitled to . . . erect or install and maintain any such poles, structures, conduits, cables, and wires in approximately the location designated by such license." RSA 231:161, VI (emphasis added). A valid license (or permit) to use or occupy municipal rights-of-way for the purpose of erecting, installing, and maintaining utility property is thus created as a result of following the procedure set forth in section 161. See RSA 231:161.

That procedure involves submitting a petition to the appropriate selectmen that describes the poles, structures, conduits, cables or wires sought to be erected and installed or maintained, and requires the selectmen to

---

[11] While unpublished orders do not have precedential value, this order is not being cited for its holding, but for its explanation of the fact that the court has yet to decide a particular issue.

22

include specific provisions in the license relating to the "designation and definition of location" of utility property in the public right-of-way. RSA 231:161, IV, V; see id. Section 161 does not require that any additional language be included to create a license to use or occupy public rights-of-way to erect, install, or maintain utility property. See RSA 231:161.

The majority nonetheless requires the incorporation of RSA 72:23, I(b) language to "legally" create a license under section 160-a despite also noting that sections 160-a and 161 should "place the utility in the same position." Attempting to force parity between sections 160-a and 161 under the majority's reasoning would inappropriately add a step to the procedure set forth in section 161 to create a license to use or occupy public rights-of-way. See id.; Polonsky v. Town of Bedford, 171 N.H. 89, 93 (2018) ("We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include."). It also leads to an absurd or unjust result, see Polonsky, 171 N.H. at 93, because, under the majority's reasoning, following the procedure, as it is laid out in section 161, would not actually confer a valid license to use or occupy municipal rights-of-way despite its plain language stating that the effect of the license "entitle[s]" the utility to do so. RSA 231:161, V; see id.

If the act of becoming "permitted or licensed" under section 161 does not require the inclusion of RSA 72:23, I(b) language, and section 160-a puts the utility and the municipality in the same position in which they would be under section 161, we would conclude that utility property can become "legally permitted or licensed" without including the language of RSA 72:23, I(b). RSA 231:160-a; see RSA 231:161; Rochester II, 151 N.H. at 266-67; Rochester I, 144 N.H. at 121-22. Therefore, there is no basis upon which to attempt to incorporate subparagraph I(b)'s language in order to effectuate the creation of a section 160-a license that is "in accordance with the law."

The fact that section 160-a licenses will necessitate an amendment to comply with RSA 72:23, I(b) is not contrary to the plain language of RSA 231:160-a, stating that utility property shall be "deemed legally permitted or licensed without further proceedings under this subdivision." RSA 231:160-a (emphasis added); see RSA 231:163 (2009) (provision in the subdivision for amending licenses). This emphasized phrase modifies the act of becoming "legally permitted or licensed," which, as discussed, does not require that the language of RSA 72:23, I(b) be included. RSA 231:160-a; see id. No further proceedings are needed to effectuate the outcome contemplated by section 160-a. See id. Compare id., with RSA 231:161.

Nor does the fact that section 160-a licenses will necessitate an amendment to comply with RSA 72:23, I(b) otherwise justify the majority's holding. When a municipality attempts to tax a utility's use or occupation of municipal rights-of-way pursuant to a section 161 license, we have repeatedly

23

held that: the license is subject to, and must satisfy, the requirements of RSA 72:23, I(b); if the license does not in fact contain the language required by subparagraph I(b), the attempt to tax the utility's use or occupation is ultra vires; and the municipality is required to amend the license to comply with RSA 72:23, I(b). See Rochester II, 151 N.H. at 266-67; Rochester I, 144 N.H. at 121-22. We see no reason, pursuant to either RSA 72:23, I, RSA 231:161, or RSA 231:160-a, why we would not apply the same holdings to circumstances in which a municipality attempts to tax a utility's use or occupation of municipal rights-of-way established by a section 160-a license. The parties have not asked us to revisit our holdings regarding section 161 licenses in interpreting section 160-a here. Nor have the parties raised any issue on appeal relating to Judge McNamara's rulings during Phase 1 pertaining to the section 161 licenses that did not in fact contain the language required by RSA 72:23, I(b) and whether amendments to those licenses corrected the deficiency for the tax year in question.

Judge McNamara addressed the need to amend section 160-a licenses in a Phase 1 order, and we agree with his reasoning. The court compared the statutory provisions of RSA 231:160-a and RSA 231:161, stating, "In either circumstance, the poles are licensed by the terms of the subdivision. Under RSA 231:163, municipalities may 'revoke or change the terms and conditions of any such license.'" (Quoting RSA 231:163.) The court went on to conclude, "By exercise of this amending authority over [section 160-a] licenses . . . , it would not be unduly burdensome for municipalities to comply with RSA 72:23, I, while simultaneously ensuring pole owners receive proper notice of their tax obligations." We have previously recognized that subparagraph I(b) serves an important notice function, explaining that the plain language of RSA 72:23, I, "contains both an enabling provision that simply allows municipalities to collect tax revenues on land that is otherwise tax exempt when it is leased [or licensed] to third parties, and a tax provision that ensures that the lessees [or licensees] are aware of, and consent to, taxation" of their use or occupation of municipal rights-of-way. Appeal of Reid, 143 N.H. 246, 253 (1998); see RSA 72:23, I(a)-(b). Pursuant to the plain language of RSA 72:23, I(b), "[a]ll leases and other agreements" are subject to its requirements for notice, see RSA 72:23, I(b), and, furthermore, as a policy matter, it is unclear why a utility would be entitled to any less notice when their poles and other property become licensed under RSA 231:160-a than what they would be entitled to receive under RSA 231:161. As Judge McNamara stated, "Indeed, common sense dictates that notice of such tax obligations would be particularly important in circumstances where existing pole locations become part of a public right-of-way." See RSA 231:160-a (providing licensing mechanism when a local land use board has previously approved the location of poles, structures, conduits, cables or wires and that location later becomes a public highway through municipal action).

24

Given the plain language of RSA 72:23, I(b), RSA 231:161, our case law applying the former to the latter, and these notice considerations, we are particularly troubled by the majority's statement that "[w]hen a utility applies for a license under RSA 231:161, it is proper to presume that in granting the license, the municipality will comply with the law, including complying with the requirements of RSA 72:23, I(b)." Employing such a presumption is contrary to the directives of RSA 72:23, I(b) itself, is inconsistent with our case law on how subparagraph I(b) applies to section 161, glosses over the importance of notice, and ignores the facts of this very case. A substantial part of this litigation involved FairPoint arguing that taxation pursuant to its RSA 231:161 licenses was ultra vires for want of the required tax-shifting language. Judge McNamara described this as the "central issue" in Phase 1, which not only involved eight towns and cities from across New Hampshire, but involved them as "representative municipalities." As demonstrated by Judge McNamara's summary judgment order in Phase 1, requiring and evaluating amendments to section 161 licenses that had been issued by representative municipalities but did not contain the required language of RSA 72:23, I(b), the licenses must in fact be, not just be presumed to be, in compliance with the law.

In sum, we find that the majority's interpretation of RSA 231:160-a does not give proper and complete consideration to the plain language of the relevant statutes or to our case law interpreting them. We respectfully dissent.

25